UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHAINWORKS, INC.,

            Plaintiff/Counter-Defendant,

                                                        File No.  1:05-CV-135

v.

                                                        HON. ROBERT HOLMES BELL

WEBCO INDUSTRIES, INC.,

            Defendant/Counter-Claimant.

_____/

# **O P I N I O N**

This dispute arises out of a requirements contract for steel tubing between Plaintiff Chainworks, Inc., and Defendant Webco Industries, Inc., governed by the Uniform Commercial Code.  Chainworks seeks a declaration that it has not breached the contract and does not owe approximately $300,000 billed by Webco.  The central issue in this case concerns Webco's ability to pass on certain additional costs incurred during the course of the contract.  Although Webco offers a variety of creative arguments in support of its position, the Court is not persuaded from the view that this is a simple breach of contract case in which the parties agreed to a fixed and certain price for Chainworks' product requirements for an entire calendar year.  As such, Webco could not unilaterally impose a new contract price.  Accordingly, for the reasons stated below, Chainworks' motion for summary judgment is granted.

I.

Webco is a steel tubing manufacturer and supplier.  Chainworks is a commercial broker of steel tubing which acts as an intermediary between Webco and third-party purchasers.  The parties have had a commercial relationship since 1999.  This case arises out of the parties' contract for 2004.  In November 2004, Webco sent a memorandum regarding pricing for the 2004 calendar year.  The memorandum provided price quotations for two types of steel tubing and specified that the prices were "[f]irm for the period 1/1/04 through 12/31/04."  Thereafter, following the federal government's removal of steel tariffs on foreign-made steel, Chainworks president, Andy Hinkley, inquired as to whether Webco's 2004 pricing would be affected.  Jeff Williams, Webco's vice president of OEM sales, replied,

> The lifting of tariffs is seen as having no effect for the next 12-months.  The worldwide market has shifted into a higher gear.  Supplies are tightening and pricing is rising – mills now have all customers on allocation.  We believe the economy, domestically and internationally, will continue to strengthen and demand, domestically and internationally, will continue to rise.
>
> The result is that this will have no effect on our thinking for SSID tubing in 2004.

Exhibit I, Pl.'s Br. Summ. J. (Docket #46).  Following this exchange, on December 8, 2003, Chainworks issued a blanket purchase order incorporating the fixed prices provided by Webco.  The blanket purchase order specified that it was a "requirements based blanket order."  Under this arrangement, Chainworks would make purchases as its needs dictated throughout the year pursuant to the blanket purchase order and Webco would ship

2

manufactured steel tubing to Chainworks' third-party purchaser (Tenneco Canada, Inc.). The blanket purchase order also incorporated Chainworks' published terms and conditions.

During the first week of January, 2004, Webco shipped the first series of steel products to Tenneco. Following the shipment, Webco mailed an invoice to Chainworks seeking payment at the price quoted in both Webco's initial price quotation and Chainworks' blanket purchase order. Webco's invoice also included its own conditions of sale. The conditions of sale included a paragraph stating: "All base prices, together with related extras and deductions, are subject to change without notice, and all orders are accepted subject to prices in effect at the time of shipment." Exhibit Q (the "price adjustment clause"), Def.'s Res. Br. (Docket #57). Shortly after sending the invoice, Webco notified Chainworks that it was monitoring "dramatic developments in the steel industry" that were creating a "tight steel availability situation as well as dramatically higher prices." Exhibit D, Def.'s Answer (Docket #6). These "dramatic developments" eventually manifested themselves through a market shift that caused prices to soar. As a result, Wheeling Pittsburgh, Webco's supplier, imposed a raw material surcharge on all steel products and demanded payment by Webco in order to continue the production and shipment of steel. Exhibit B, Def.'s Res. Br. In response, Webco attempted to pass on the surcharge to Chainworks. On January 27, 2004, Jeff Williams notified Andy Hinkley that Webco would be assessing a surcharge on steel products shipped to Chainworks effective February 1, 2004. Webco advised that "[i]n order

3

. . . to maintain an uninterrupted supply of material to Chainworks; I must have, in writing, your acceptance of these charges."  Exhibit G, Def.'s Res. Br.

Throughout February, Webco sought Chainworks' acceptance of the surcharge, warning "[i]f Chainworks does not wish to pay the surcharge, we will advise our material supplier that Webco cannot pay the surcharge for Chainworks raw material and we anticipate they will refuse to ship."  Exhibit B, Def.'s Res. Br.  On March 1, 2004, Hinkley sent the following memorandum to Williams:

> In the interest of maintaining an uninterrupted supply of your products for our customers, we feel that we have no other option but to accept the steel surcharge that you intend to impose on us, as described in your letter dated January 27, 2004.  We sincerely hope that you will reconsider straddling us with these additional financial burdens, as we are not likely to obtain similar accommodation from our customers.
>
> Given the current lack of alternatives and in the interest of mitigating our losses, we are making this concession under duress and reserve all rights and remedies that we may otherwise have under our original agreement.

Exhibit S, Pl.'s Br. Summ. J.  Thereafter, Webco sent monthly notices of the surcharge amount to be applied to future shipments.  Exhibits K – R, Pl.'s Br. Summ. J.  Between March and August, Chainworks continued to authorize the manufacture and shipment of products to Tenneco as needed.

On August 23, 2004, Williams notified Hinkley that, in addition to the raw material surcharge, Webco was raising the price of its steel tubing products.  Exhibit O, Pl.'s Br. Summ. J.  Again, Williams cautioned that "Webco must have your agreement to accept this price revision or we will not be able to continue to order raw material or accept future

releases for shipment." *Id*. In a nearly identically worded memorandum to the March 1, 2004 letter, Hinkley agreed to the price increases, explaining that Chainworks believed it was conceding under duress and in order to mitigate its losses. Exhibit T, Pl.'s Br. Summ. J. Once again, Hinkley advised that Chainworks "reserve[d] all rights and remedies that we may otherwise have under our original agreement." *Id*. Thereafter, Chainworks again authorized Webco to manufacture and ship products to Tenneco through December.

Beginning in September and continuing through December, the parties attempted to negotiate a contract for the following year. Although the parties' discussed pricing arrangements for 2005, both parties agree that a contract was never entered into. In addition to the contract negotiations, in December 2004, Chainworks requested that three steel product shipments be sent to Chainworks' warehouse, rather than directly to Tenneco's facility.

On January 7, 2005, Chainworks notified Webco that it had entered into a requirements contract for 2005 with a Korean supplier and would not continue its relationship with Webco. Upon receipt of the final invoice for 2004, Chainworks discounted all surcharges and price increases assessed during the year from its final payment. This amounted to $301,949.78. The parties do not dispute that the amount allegedly owed only encompasses surcharges and price increases assessed during 2004. Chainworks contends that it is not required to pay this amount under the 2004 contract and seeks a declaratory judgment on this issue. Conversely, the failure to pay this amount provides the basis for Webco's

counterclaim for breach of contract against Chainworks.  Webco also alleges counterclaims for account stated, unjust enrichment, promissory estoppel, and fraudulent and/or negligent misrepresentation.  The counterclaims stem from Chainworks' failure to inform Webco that it did not intend to enter into a contract for 2005 as well as Chainworks' alleged stock-piling of products at the end of 2004.  Before the Court is Chainworks' motion for summary judgment on its declaratory judgment claim and on Webco's counterclaims.

*Procedural Background*

This Court previously denied Webco's motion to compel arbitration.  *See* Opinion and Order Approving and Adopting Report and Recommendation, 1:05-CV-135 (June 10, 2005) (Docket #19, 20).  The Court, applying MICH. COMP. LAWS § 440.2207(1), held that a contract was formed between the parties under the UCC.  Chainworks' blanket purchase order constituted an offer and Webco's delivery of the products and issuance of an invoice constituted a definite and seasonable expression of acceptance, even though it stated terms additional to or different from those contained in the offer.  Further, the Court determined that Webco's invoice and conditions of sale did not "clearly reveal that [Webco] was unwilling to proceed unless they were assured of [Chainworks] assent to the additional or different terms."  June 10, 2005 Opinion at 3 (citing *Challenge Mach. Co. v. Mattison Mach. Works*, 138 Mich. App. 15, 22, 359 N.W.2d 232, 235 (1984)).  Accordingly, a contract was formed between the parties under § 2-207(1).

6

The Court then applied § 2-207(2) and found that the arbitration provision contained in Webco's conditions of sale was an "additional term," and as such, did not become part of the contract because Chainworks' offer expressly limited acceptance to the terms of the offer. Because the arbitration clause was not part of the agreement between the parties, Webco's motion to compel arbitration was denied.

## II.

Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005); *Layne v. Bank One, Ky, N.A.*, 395 F.3d 271, 275 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in the favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005).

Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the non-moving party has the burden of coming forward with

evidence raising a triable issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Although the facts are viewed in the light most favorable to the non-movant, they may not

rest on the mere allegations of his pleadings.  FED. R. CIV. P. 56(e); *Daniel v. Cantrell*, 375

F.3d 377, 381 (6th Cir. 2004).  "A mere scintilla of evidence is insufficient."  *Humenny v.*

*Genex Corp.*, 390 F.3d 901, 904 (6th Cir. 2004).

III.

A.     Chainworks' Breach of Contract Claim

In its breach of contract claim, Chainworks alleges that Webco breached the 2004

contract by unilaterally imposing the surcharges and price increase.  Chainworks' position

can be summed up in a relatively simple fashion: a deal is a deal.  That is, the parties agreed

to a contract that would provide Chainworks with all the steel tubing it required during 2004

at a fixed price.  When Webco sought to increase that price, it breached the contract.

Accordingly, Chainworks seeks a declaration that it has fulfilled the terms of the original

contract and, thus, does not owe the remaining balance.

Against this simple, straightforward analysis, Webco has offered numerous creative

arguments, based on various provisions of the UCC and common law, in an attempt to justify

its actions and avoid summary judgment.  Webco's arguments include the following: 1) that

under UCC § 2-207, the parties' contract included a term permitting Webco to alter the

contract price, 2) that Chainworks' agreed to the surcharges and price increases, and 3) that

the impracticability defense under UCC § 2-615 applies and permits Webco's failure to abide

8

by the original, fixed contract price.  Finally, Webco also alleges that Chainworks is barred from any recovery because it did not properly provide notice that it considered the price increase a breach of contract.

After reviewing the record in this case, the parties' briefs, and hearing oral argument, the Court is led to the conclusion that Chainworks' view is correct, as a matter of law, and summary judgment should be entered in its favor on the breach of contract claim.  Webco's arguments to the contrary are unavailing.  At its essence this is a simple breach of contract case.  The parties entered into a contract under which Webco agreed to provide all of Chainworks' steel tubing needs for 2004 in exchange for a fixed price.  After this contract was entered into, Webco attempted to unilaterally alter the price.  This was a clear breach of contract and Chainworks is not required to pay the additional cost unilaterally imposed by Webco.  A review of Webco's arguments to the contrary reveals that each lacks merit.

1.      The Battle of the Forms

Webco first contends that it had the authority to alter the contract price based on the price adjustment clause contained in its invoice.  Because Webco relies on a clause contained in its invoice, the Court must determine whether the price adjustment clause is part of the contract.  This requires a review of § 2-207 of the UCC, a passage well known to first year law students as the "Battle of the Forms" provision.  Michigan's version of § 2-207 provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or

agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
(a) the offer expressly limits acceptance to the terms of the offer;
(b) they materially alter it; or
(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

MICH. COMP. LAWS § 440.2207 (2001). The parties agree and the Court has previously held that Chainworks' December 8, 2003 blanket purchase order was an offer. The blanket purchase order incorporated the fixed pricing terms provided by Webco to Chainworks on November 26, 2003. *See* Exhibit H, Pl.'s Br. Summ. J. (Webco's Price Quotation); Exhibit C, Pl.'s Br. Summ. J. (Chainworks' Blanket Purchase Order). The blanket purchase order also specified the terms of acceptance: "This order can be accepted in writing or by delivery, the rendering of services, or commencement of work on supplies be (sic) manufactured for Buyer, pursuant to this order." Exhibit C, ¶ 3. Based upon this provision, Chainworks argues that Webco accepted the offer by shipping the first series of products in early January and that the subsequent invoice containing Webco's own terms and conditions is irrelevant and cannot modify the existing contract. While the Court finds that this argument is

convincing and thus renders the "Battle of the Forms" analysis unnecessary, *see* MICH.COMP.

LAWS § 440.2206, *Litton Microwave Cooking Prods. v. Leviton Mfg. Co., Inc.*, 15 F.3d 790,

794 (8th Cir. 1994) (construing Minnesota's version of the UCC) ("For a 'battle of the forms'

to arise and trigger the provisions of § 2-207, there must be conflicting forms to begin with

. . . ."), for the purposes of the Court's analysis, the Court will assume that Webco's invoice

was the acceptance and mandates an analysis under § 2-207.

Webco's invoice contained the same price term as Chainworks' blanket purchase

order.  Exhibit C, D, Pl.'s Br. Summ. J.  In addition, the invoice also contained Webco's

conditions of sale which included terms additional to or different from those contained in the

offer.  In the Court's previous opinion in this case, it held that the invoice was an acceptance

under § 2-207(1), even though it included the additional or different terms.  June 10, 2005

Opinion at 2-3.  The Court also rejected Webco's argument that the acceptance was expressly

made conditional on assent to the additional or different terms.  *Id*. at 3.  The Court

determined that Webco's invoice and conditions of sale did not clearly reveal an

unwillingness to proceed absent assent to the additional or different terms.  Therefore,

Webco's invoice constituted a definite and seasonable expression of acceptance under § 2-

207(1).  *Id*. at 3-4.

Despite the Court's previous findings regarding Webco's invoice, Webco appears to

argue that it did clearly express its unwillingness to proceed unless Chainworks' accepted

Webco's price adjustment clause.  Webco's position is misguided and attempts to rely on

11

events occurring after the contract was formed.  Webco's argument is also based on the faulty assumption that the parties did not enter into a contract for the entire year, but rather agreed to a series of incremental contracts in which each production release during the year was a new offer and each invoice was a new acceptance.

Webco's argument is directly contrary to the Court's previous holding that the invoice was a definite and seasonable expression of acceptance and is contrary to the undisputed evidence in this case.  First, the events relied upon by Webco to support its claim that it clearly expressed its unwillingness to proceed occurred after the first shipment and invoice. *See* Exhibit B, Def.'s Res. Br. (email dated February 10, 2004); Exhibit G, Def.'s Res. Br. (letter dated January 27, 2004).  By its terms, § 2-207 precludes Webco's reliance on these post-acceptance letters.  *See* MICH. COMP. LAWS § 440.2207(1).  Second, Webco also appears to be attempting to circumvent this conclusion by raising the novel argument that the parties entered into a series of contracts throughout 2004.

The contract formed between the parties in January 2004 was a requirements contract for the entire year.  The best evidence of this fact comes from the face of the blanket purchase order which states: "THIS IS A REQUIREMENTS BASED BLANKET ORDER. THIS IS NOT AN AUTHORIZATION TO MANUFACTURE.  INDIVIDUAL PRODUCTION RELEASES WILL BE ISSUED AS REQUIRED VIA A SEPARATE DOCUMENT AGAINST THIS BLANKET ORDER."  Exhibit C, Pl.'s Br. Summ. J. (emphasis in original).  Nothing in the purchase order or in Webco's invoices indicates that

12

the parties entered into a series of contracts, rather than a single contract for the entire year.[1]

Moreover, Webco, as the non-moving party on summary judgment, has the burden of bringing forth evidence to support a genuine issue of fact. *See Celotex, Inc.*, 477 U.S. at 323. Webco has not pointed to any evidence, whether in the form of the parties' prior course of dealing or their course of performance under the contract at issue, that would support its assertion that the parties' agreed to a series of contracts.[2]   Accordingly, the Court rejects Webco's argument that this contract was anything other than a requirements contract for the entire year and holds that Webco accepted Chainworks' offer through the January 6, 2004 invoice.

---

[1]Moreover, Webco's price quotation is further evidence clearly indicating that the parties intended their agreement to encompass Chainworks' requirements for the entire year. Webco's price quotation indicates that the quoted prices are "[f]irm for the period 1/1/04 through 12/31/04" and are "[b]ased upon Webco maintaining 100% participation for each item." Exhibit H, Pl.'s Br. Summ. J. Further, in Webco's letter announcing the surcharge it refers to the "contract" between the parties, not a "series of contracts," as Webco now alleges. Exhibit B, Def.'s Res. Br.

[2]At best, Webco offers a case from this circuit in which the court viewed the parties dealings as a series of contracts. *See Gage Prods. Co. v. Henkel Corp.*, 393 F.3d 629 (6th Cir. 2004). Webco's reliance on *Gage* is misplaced. While the court in *Gage* evaluated the parties' exchange of writings and shipments as a series of contracts, it did so because it found that the defendant's purchase order in response to the seller's original offer was not an acceptance because the writings were directly contradictory on the issue of price. *Gage Prods. Co.*, 393 F.3d at 638. Based on this fact, the court held that the parties did not have a contract and proceeded to evaluate their subsequent conduct to determine if it formed a contract or a series of contracts. This is completely distinguishable from the facts of this case. In this case, unlike *Gage*, the parties' offer and acceptance clearly demonstrated that the parties had a meeting of minds sufficient to form a contract, including on the issue of price. Therefore, unlike *Gage*, there is no need to evaluate the parties' dealings following the formation of the contract to determine if a series of contracts was formed.

The next step in the § 2-207 analysis is to determine whether Webco's price adjustment clause is an additional or different term. If the term is additional, it becomes part of the contract unless: the offer expressly limited acceptance to the terms of the offer, the term materially alters the contract, or the buyer timely objects to the additional term. MICH. COMP. LAWS § 440.2207(2). If the clause is a different term, the conflicting terms cancel each other out and do not become part of the contract. *Challenge Mach.*, 359 N.W.2d at 237. The terms of the contract then consist of the terms agreed upon by the parties and other terms supplied by the UCC.

Webco's price adjustment clause provides "[a]ll base prices . . . are subject to change without notice, and all orders are accepted subject to prices in effect at the time of shipment." Exhibit Q, Def.'s Res. Br. Webco argues that this term is different from and conflicts with a clause in Chainworks' terms and conditions which provides: "[i]nvoice payment terms, FOB point, part number, description and price are as listed on the face of the PO." Exhibit C, ¶ 6, Pl.'s Br. Summ. J. Webco describes these clauses as conflicting "price terms." This is a mischaracterization of the terms. As stated previously, the blanket purchase order and invoice contained the same price term. In addition to the price term, however, Webco added its price adjustment clause. The price adjustment clause is not a "price term" at all, but is a

14

mechanism through which the price could be altered.  This price adjustment mechanism was not addressed in the blanket purchase order and is clearly an additional term.[3]

In the Court's previous opinion, the Court applied § 2-207(2) to an additional arbitration clause contained in Webco's conditions of sale.  In finding that the arbitration clause was not part of the parties' contract, the Court held that Chainworks' expressly limited acceptance to the terms of the offer.  June 10, 2005 Opinion at 5; MICH. COMP. LAWS § 440.2207(2)(a).  This analysis applies with equal force to Webco's price adjustment clause.  Under § 2-207(2)(a), the price adjustment clause did not become part of the contract because it was an additional term and Chainworks' expressly limited acceptance to the terms contained in its offer.  *See* ¶¶ 4, 5, Exhibit C, Pl.'s Br. Summ. J.[4]  Accordingly, Webco's price

_____

[3]At oral argument, Webco appeared to abandon its reliance on ¶ 6 of Chainworks' purchase order as the conflicting provision with the price adjustment clause and shifted its argument to ¶ 5 of the purchase order.  Paragraph 5 specifies that any modification to the purchase order will be issued by Chainworks and reserves the right to modify the order in the future.  Exhibit C, Pl.'s Mot. Summ. J.  Even assuming that ¶ 5 of the purchase order and Webco's price adjustment clause conflict, and therefore knock each other out, this result does not assist Webco in its assertion that the surcharge and price increase were permitted under the contract nor does it create an issue of fact as to price.  The offer and acceptance agreed on the same fixed price.  A determination that ¶ 5 and the price adjustment clause conflict merely precludes each party from unilaterally modifying the contract, it does not affect the agreed upon price.

[4]Moreover, a strong argument can be made that § 2-207(2)(b) (additional terms that materially alter the contract do not become part of the contract) also precludes Webco's price adjustment clause from becoming part of the contract.  It is quite apparent that a clause mandating that the contract price is subject to change without notice and through which one party attempted to unilaterally alter the price would be a material alteration of the contract terms.

adjustment clause is not part of the contract between the parties.  Therefore, Webco cannot rely on the clause to justify its unilateral assessment of surcharges and a price increase.

2.      Negotiation and Modification of the 2004 contract

Webco next argues that the surcharge and price increase were permissible because the parties negotiated the increases and agreed to modify the contract.  In support of this argument, Webco points to a series of letters it sent to Chainworks following the rise of the market price for steel and Wheeling Pittsburgh's assessment of the raw material surcharge, as well as Chainworks eventual acceptance of the surcharge. *See* Exhibit B, G, Def.'s Res. Br.; Exhibit S, Pl.'s Br. Summ. J.  A review of the record reveals that this argument is completely misguided and contrary to the undisputed evidence in this case.

The letters relied upon by Webco do not indicate a negotiation of a contract modification, but rather demonstrate Webco's attempt to force Chainworks into accepting the surcharge.  In the January 27, 2004 letter, Jeff Williams explained to Andy Hinkley that Webco did not have any other choice but to assess a raw material surcharge on all steel product shipments.  Exhibit G, Def.'s Res. Br.  After explaining the amount of the surcharge and the method by which it would be assessed, Williams stated:

> Please allow me to be clear, the tactics being employed by our suppliers leave no room for negotiation.  *In order for Webco to maintain an uninterrupted supply of material to Chainworks; I must have, in writing, your acceptance of these charges.*
> . . . .
> Webco does not take these actions lightly, this is a position that is being forced upon us all.  *Webco cannot and will not, unilaterally, absorb these additional costs.*

16

Exhibit G, Def.'s Res. Br. (emphasis added).  Two weeks later, Webco reiterated its position,

explaining that it would not absorb the cost on Chainworks' behalf and "[i]f Chainworks does

not wish to pay the surcharge, we will advise our material supplier that Webco cannot pay

the surcharge for Chainworks raw material and we anticipate they will refuse to ship.  This

will very quickly cause delivery problems."  Exhibit B, Def.'s Res. Br.

        The letters are not an attempt to negotiate with Chainworks.  In fact, Williams' letter

unequivocally states that there is no room to negotiate the surcharges.  Exhibit G, Def.'s Res.

Br.  Rather than a negotiation, Webco's letters amount to a refusal to perform the parties'

contract absent the inclusion of the surcharge.  In effect, Webco threatened to breach the

parties' contract if Chainworks did not agree to pay the surcharge.  *See e.g.*, MICH. COMP.

LAWS § 440.2610, Official Comment 2 (explaining that a repudiation of a contract occurs

when a demand by one party "amounts to a statement of intention not to perform except on

conditions which go beyond the contract.").  No other conclusion can be drawn from the

reference in the letters to Chainworks' interest in maintaining an "uninterrupted supply" and

"delivery problems" in the event Chainworks refuses to pay the surcharge.

        Webco presented Chainworks with nothing more than a Hobson's choice, in which

Chainworks was forced to choose between imposition of the surcharge or the prospect of its

steel supply ending, with the resultant ill effect on Chainworks' agreement with its third-party

purchaser, Tenneco.   To construe such activity as negotiation and acceptance of a

modification would stretch these concepts to their breaking point.  Moreover, as will be

discussed more fully below, Chainworks' purported acceptance of the surcharge clearly indicated that it had no other choice but to accept the charge and that it reserved any rights and remedies it had under the parties' original agreement.  Exhibit S, Pl.'s Mot. Summ. J. Therefore, Webco's reliance on the parties' correspondence as evidence of negotiations and acceptance of a modification to the contract is misplaced.[5]

3.      Impracticability

Webco next argues that the surcharge and price increase were permissible because unforeseen market conditions rendered its performance impracticable under the original contract.  Section 2-615 of the UCC allows a seller to raise impracticability as a defense in a sales contract.  MICH. COMP. LAWS § 440.2615; *Cleveland-Cliffs Iron Co. v. Chicago & North Western Transp. Co.*, 581 F. Supp. 1144, 1151 (W.D. Mich. 1984) (Hillman, J.). Section 2-615 provides in pertinent part:

> Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

--------------------------------------------------

[5]The Court also notes that Webco has failed to address any negotiations leading up to the price increase in August 2004.  The only evidence in the record regarding the price increase further demonstrates that, similar to the surcharge, Webco unilaterally imposed the price increase and forced Chainworks to accept it under the threat of repudiating the contract. *See* Exhibit O, Pl.'s Br. Summ. J. ("Webco must have your agreement to accept this price revision or we will not be able to continue to order raw material or accept future releases for shipment.").

MICH. COMP. LAWS § 440.2615.  A party asserting the impracticability defense must prove the following: 1) that an unforeseeable event occurred; 2) the nonoccurrence of the event was a basic assumption underlying the agreement; and 3) the event rendered performance impracticable.  *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 149 (6th Cir. 1983) (interpreting Ohio's version of the UCC).

Webco argues that the dramatic rise in the market price for steel in early 2004 was not foreseeable and rendered its performance under its contract with Chainworks impracticable. Webco does not argue that it was unable to deliver product, that it was unable to obtain quality materials, or that there was a severe shortage of available material.[6]  Rather, it argues only that, due to the industry-wide surcharge, the cost to procure raw materials rose dramatically.  It is abundantly clear to the Court, however, that increased cost, without more, does not support a claim of impracticability.[7]  *See Roth Steel Prods.*, 705 F.2d at 149 n. 34 ("Increases in the cost of production, however, do not, absent more, support a claim of commercial impracticability."); *Bernia Dist., Inc. v. Bernia Sewing Mach. Co., Inc.*, 646 F.2d 434, 439-40 (10th Cir. 1981) ("[C]ost increases alone, though great in extent, do not render

---

[6]At best, Webco asserts that there was a shortage of material in the sense that it could not obtain material that was not subject to a surcharge.

[7]Webco's argument that the raw material surcharge is something other than an increased cost is unavailing.  It is undisputed that the surcharge increased Webco's production costs.  *See* Exhibit G, Def.'s Res. Br. (describing the surcharge assessed by Wheeling Pittsburgh as an "additional cost").  The form which the increase takes, whether a surcharge or price increase, is irrelevant and does not change the fact that the rise in the steel market and assessment of the surcharge resulted in increased costs for Webco.

a contract impracticable."); *Transatlantic Financing Corp. v. United States*, 363 F.2d 312, 319 (D.C. Cir. 1966); *Eastern Airlines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 439-40 (S.D. Fla. 1975); Official Comment 4, MICH. COMP. LAWS § 440.2615.  Moreover, Webco has failed to demonstrate that the shift in the market price was the result of an unforeseen contingency.

The undisputed evidence before the Court shows that the parties knew that the steel market was volatile and that an increase in raw material costs was foreseeable.  First, Chainworks has provided a series of press releases from various steel companies announcing the imposition of surcharges due to the increase in raw material costs.  *See* Exhibit F, Pl.'s Reply Br.  The press releases were issued during December 2003, prior to Webco's acceptance, and explain that the surcharges are being assessed due to rapid increases in raw material prices.  Further, the releases describe "recent volatility" in the steel market, a "perfect storm in the market," "enormous cost pressures" on all steel producers, and that "the major topic of conversation in and around the US steel industry" is the rapid increase in raw material costs.  The sheer number of press releases filed in this case illustrates that the upward volatility of the market was clearly apparent prior to Webco's acceptance of Chainworks' offer.  Further, as a sophisticated business entity and member of the steel industry, Webco was certainly aware of these volatile market conditions and the steps that steel companies were taking in response.

In fact there is undisputed evidence in the record that Webco was aware of the volatility in the marketplace prior to entering into the contract with Chainworks. In an email dated December 4, 2003, Jeff Williams stated "[t]he worldwide market has shifted into a higher gear. *Supplies are tightening and pricing is rising* – mills now have all customers on allocation." Exhibit I, Pl.'s Br. Summ. J. (emphasis added). Nevertheless, Williams concluded that Webco's fixed pricing for 2004 would remain unchanged.[8] *Id*.

Second, the parties' previous dealings also indicate that they understood that raw material pricing could fluctuate. In mid-2002, the parties attempted to negotiate a long term agreement that included a pricing adjustment clause that would allow the contract price to rise or fall if the raw material price rose above or fell below a certain percentage of the original contract price. Exhibit E, F, Pl.'s Br. Summ. J. While the parties' negotiations did not result in a long term contract, the discussion of a pricing adjustment clause indicates that the parties were well aware that raw material pricing could fluctuate during the course of their dealings with each other. This is further evidence that the increase in raw material costs was foreseeable prior to the parties' contract.[9]

---

[8]The Court also notes that attached to Williams' email was a news article dated December 2, 2003, explaining that the global steel market faced a "roller coaster ride." The article predicted that steel export prices would reach unsustainable levels before entering into the "fifth pricing death spiral on the world steel export market since 1995." Exhibit I, Pl.'s Br. Summ. J. This is further evidence of Webco's knowledge of the market conditions prior to entering into the contract.

[9]Moreover, as Chainworks' points out, the negotiation and rejection of the pricing adjustment clause also indicates that the non-occurrence of a market shift was not a "basic assumption on which the contract was made." MICH. COMP. LAWS § 440.2615(a). To the contrary, by rejecting the adjustment clause in favor of fixed pricing, the parties assumed the risk that the price could rise or fall during the contract's duration.

In response to this evidence, Webco has offered a selection of news articles that it contends shows that the price increase did not occur until January 2004, after the parties entered into their contract. *See* Exhibit T, Pl.'s Res. Br. Rather than creating a genuine issue of fact for trial, the articles simply reinforce the conclusion that the raw material cost increase was foreseeable before the parties' contract. While the articles do indicate that steel pricing increased during January and February 2004, they also describe the historical volatility of the steel market as far back as 1995. According to the articles, steel pricing has fluctuated throughout the late 1990's and into 2003. This is simply further evidence that a market shift was foreseeable prior to the parties' agreement.

Webco has failed to allege a triable issue with respect to the foreseeability of the increased costs. The evidence demonstrates that, prior to the parties' contract, both Webco and Chainworks understood that the steel market was volatile and that steel manufacturers were imposing surcharges due to raw material price increases. Based on this evidence, it is clear that the increased costs incurred by Webco were not unforeseeable and do not support the assertion of the impracticability defense. At best, the evidence shows that while increased costs were foreseeable, Webco either misjudged or did not anticipate the *degree* of the increase. In the midst of this volatile market climate, the parties agreed to a contract that provided for the payment of a fixed, certain price. Webco cannot, after the fact, alter the contract based on impracticability simply because it may have misread the market and

entered into a contract which became a greater financial burden than originally expected.[10]
*Neal-Cooper Grain C. v. Texas Gulf Sulfur Co.*, 508 F.2d 283, 294 (7th Cir. 1974) ("The
buyer has a right to rely on the party to the contract to supply him with goods regardless of
what happens to the market price.  That is the purpose for which such contracts are made.");
MICH. COMP. LAWS § 440.2615 Official Comment 4 ("Neither is a rise or a collapse in the
market in itself a justification, for that is exactly the type of business risk which business
contracts made at fixed prices are intended to cover."); 1 J. WHITE & R. SUMMERS, UNIFORM
COMMERCIAL CODE § 3-10 (4th ed. 1995) (discussing increased costs as a basis for
impracticability under § 2-615 and concluding "[i]n our judgment an increase in price, even
a radical increase in price, is the thing that contracts are designed to protect against.").

---

[10]In reaching this conclusion, the Court recognizes that Webco's Chief Financial
Officer has offered a financial forecast indicating that if Webco was forced to absorb the
increased costs, it would have become insolvent during 2004.  *See* Exhibit U, Def.'s Res. Br.
Given the fact that it was foreseeable that raw material pricing was on the rise during late
2003 and that the parties, as indicated by their previous dealings, understood that raw
material pricing was volatile, it is of limited relevance that Webco may have entered into a
contract which eventually became an unprofitable venture.  *See e.g.*, *Karl Wendt Farm
Equipment Co., Inc. v. Int'l Harvester Co.*, 931 F.2d 1112, 1117 (6th Cir. 1991) (non-UCC
case construing Michigan law on defense of impracticability and impossibility) (holding that
Michigan Supreme Court would not apply impracticability where as a result of a dramatic
downturn in farm equipment market, seller was losing $2,000,000 per day and may have had
to declare bankruptcy absent terminating the contract); *Iowa Elec. Light & Power Co. v. Atlas
Corp.*, 467 F. Supp. 129 (N.D. Iowa 1978) (Iowa version of the UCC) (holding that an
increase in seller's costs by 52.2% resulting in the seller's loss of approximately $2.67
million, failed to constitute commercial impracticability), *rev'd on other grounds*, 603 F.2d
1301 (8th Cir. 1979); *Publicker Indus. v. Union Carbide Corp.*, 17 UCC Rep. Serv. 989
(E.D. Pa. 1975) (holding that loss of $5.8 million did not render contract impracticable or
excuse performance under force majeure clause).

4.      Notice of Breach

Finally, Webco contends that Chainworks is precluded from obtaining its requested relief because it failed to provide adequate notice that the surcharge and price increase were breaches of contract.[11]  Webco first appears to rely on UCC § 2-717 to argue that Chainworks failed to provide advance notice prior to refusing to pay $301,949.78 at the end of 2004. Section 2-717 grants a buyer a right of setoff: "The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."  MICH. COMP. LAWS § 440.2717.

To the extent that Webco relies on this provision to preclude Chainworks from recovery, the Court finds that it is not applicable to this case.  The parties do not dispute that Chainworks paid the entire amount owed under the original fixed price terms of the contract. The parties agree that the remaining $301,949.78 constitutes the total amount of surcharges and price increase imposed by Webco.  As stated more fully above, the surcharge and price increase were not authorized under the terms of the contract.  In other words, Chainworks is not withholding or deducting any damages because Webco is not entitled to the additional amounts assessed outside the terms of the contract.

---

[11]The Court notes that this argument was not raised in Webco's answer or affirmative defenses but was first alleged in response to Chainworks' motion for summary judgment. *See* Def.'s Answer and Affirmative Defenses (Docket #38).

Consequently, § 2-717 is not applicable because that section only applies where the buyer deducts damages from the purchase price, after notifying the seller of its intent to do so, and only when the deduction is from the purchase price due under the same contract. *Purofied Down Products Corp. v. Royal Down Products, Inc.*, 87 F.R.D. 685, 688 (W.D. Mich. 1980) (Hillman, J.) (citing 2 Anderson, Uniform Commercial Code § 2-717: 3, 4, p. 490-91 (1971)).  In this case, Chainworks has not deducted any damages from the purchase price owed under the parties' contract.  To the contrary, there is no dispute that Chainworks has paid the entire amount owed under the contract.  Rather than deducting damages, Chainworks has properly refused to pay additional amounts assessed that are outside the contract.  Section 2-717 does not cover such a situation and is not applicable to this case.

Nevertheless, Webco also points to UCC § 2-607 and cases interpreting it to argue that Chainworks is barred from recovery due to its failure to notify Webco that it considered the price increase to be a breach of contract.  Section 2-607 provides that where a tender of goods has been accepted: "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."  MICH. COMP. LAWS § 440.2607(3)(a).

Webco relies on *K & M Joint Venture v. Smith Int'l, Inc.*, 669 F.2d 1106 (6th Cir. 1982), and *Roth Steel Products*, 705 F.2d at 151-52, in support of the proposition that it is not sufficient that the seller be given notice of the mere facts constituting a nonconforming tender; the seller must also be informed that the buyer considers him to be in breach of the

contract. Both cases interpret Ohio's version of the UCC and are undermined by the fact that Ohio courts have subsequently rejected the Sixth Circuit's strict reading of the notification requirement. *See Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 638 (Ohio 1989) ("We reject the strict reading of [§ 2-607(3)(a)] . . . as we believe that notice may be sufficient under the statute despite the fact that the notice does not specifically allege a breach of contract.").

Moreover, this Court has previously expressly rejected *K & M Joint Venture* and *Roth Steel*, holding that the strict view of notification was inconsistent with Michigan law, the official comments to the UCC, and the approach of the majority of states. *Eaton Corp. v. Pfizer, Inc.*, 4:96-CV-162 (W.D. Mich. May 12, 1998) (Bell, J.) (Docket #138) (unpublished). The Court held that a more lenient standard was consistent with Michigan law, "the notice of a breach of warranty must only inform the seller that there are outstanding problems with the transaction." *Eaton Corp.* at 14 (quoting *Michigan Sugar Co. v. Jebavy Sorenson Orchard Co.*, 66 Mich. App. 642, 647, 239 N.W.2d 693, 696 (1976)); *see also Nartron Corp. v. Hamilton/Avnet Elec. of Arizona, Inc.*, 1991 WL 303604 at *2 (W.D. Mich. Nov. 1, 1991) (Gibson, C.J.) ("according to Michigan law, notice is sufficient if it alerts the seller that the transaction is troublesome and must be watched."). The Official Comments to § 2-607 are also consistent with this lenient standard:

> The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason . . . for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves

> the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

Official Comment 4, MICH. COMP. LAWS § 440.2607.  Other circuits applying the lenient standard focus on the "transaction is still troublesome and must be watched" language of the Official Comment.  *See e.g.*, *Aqualon Co. v. Mac Equipment, Inc.*, 149 F.3d 262, 267 (U.C.C.) (4th Cir. 1998); *Arcor, Inc. v. Textron, Inc.*, 960 F.2d 710, 715 (7th Cir. 1992) (Illinois law) ("[N]otification need merely be sufficient to let the seller know that the transaction is still troublesome.  There is no need to state all objections the buyer has or for the buyer to say he is holding the seller liable and threaten litigation."); *Northern States Power Co. v. ITT Meyer Indus.*, 777 F.2d 405, 408 (8th Cir. 1985) (Minnesota law) ("We have held that the notice which satisfies this section need only be such that informs the seller that the transaction is troublesome and needs to be watched.").

Finally, the Court also notes that, while Michigan has not adopted the strict or lenient standard, recent caselaw looks to the policies underlying the UCC's notice provision in determining the adequacy of notice of breach.  *See American Bumper & Mfg. Co. v. Transtechnology Corp.*, 252 Mich. App. 340, 346-47, 652 N.W.2d 252, 256 (2002).  The underlying policies of the notice requirement include: 1) to prevent surprise and allow the seller the opportunity to make recommendations how to cure the nonconformance; 2) to allow the seller the fair opportunity to investigate and prepare for litigation; 3) to open the

way for settlement of claims through negotiation; and 4) to protect the seller from stale

claims and provide certainty in contractual arrangements.  *Id.*

With these principles in mind, the Court turns to the evidence presented by the parties

in this case.  Both parties agree that the March 1, 2004 memo from Andy Hinkley to Jeff

Williams is the relevant piece of evidence on the notice issue.[12]  The memo stated:

> In the interest of maintaining an uninterrupted supply of your products for our
> customers, we feel that we have no other option but to accept the steel
> surcharge that you intend to impose on us, as described in your letter dated
> January 27, 2004.  We sincerely hope that you will reconsider straddling us
> with these additional financial burdens, as we are not likely to obtain similar
> accommodation from our customers.
>
> Given the current lack of alternatives and in the interest of mitigating our
> losses, we are making this concession under duress and reserve all rights and
> remedies that we may otherwise have under our original agreement.

Exhibit S, Pl.'s Br. Summ. J.  This letter clearly advised Webco that there were outstanding

problems with the transaction by informing Webco that it considered the surcharge to be

outside the contract.  Further, the letter's reference to "mitigating our losses" and reserving

all remedies under the original contract clearly informed Webco that Chainworks considered

the surcharge to be a breach and that a future action for damages was possible. This satisfied

the requirements and underlying policies of § 2-607(3).

The context in which this letter was written cannot be overlooked.  Hinkley's letter

was written after Webco repeatedly threatened to cut off further deliveries absent the

---

[12]This analysis also applies to Chainworks' identically-worded letter of September 1,
2004 responding to Webco's price increase.  Exhibit T, Pl.'s Mot. Summ. J.

imposition of the surcharge. Therefore, Chainworks was placed in the unenviable position of losing its steel tubing supply for 2004 by refusing to pay (and facing the inevitable legal consequences from Tenneco that this decision would entail) or accepting a price increase that was outside the contract. Chainworks chose the latter course; notifying Webco that in the interest of maintaining the supply that it had already contracted for, it would acquiesce in the surcharge assessment but would reserve all remedies and rights under the contract.

Webco's argument that Chainworks' reservation of rights referred only to "warranty related remedies" is disingenuous. First, Hinkley's letter clearly states Chainworks is "reserving *all* remedies" under the original contract, not simply warranty-related remedies. Second, in light of the fact that Hinkley's letter responded to Webco's announcement of a price increase, it is not reasonable to assume that the reservation of rights referred to anything other than the single issue that arose between the parties regarding the price. Further, Webco's assertion that Chainworks' notice did not give them an opportunity to cure or negotiate the price further is undermined by its own statements prior to receiving Chainworks notice. Webco made it clear that the surcharge was non-negotiable, that it was not going to absorb the additional cost, and that Chainworks could either accept it or lose its supply. Exhibit B, G, Def.'s Res. Br.

Finally, throughout Webco's discussion of the notice issue, it refers to Chainworks' bad faith in "actively misleading" Webco by appearing to accept the surcharge and then proceeding to authorize and accept 88 shipments of steel tubing during the course of the year.

This is a mischaracterization of the undisputed facts in the case. After being threatened with losing its product supply, Chainworks agreed to the surcharge with the reservation of its remedies under the original contract. Although Webco has repeatedly overlooked it, at no time did Chainworks accept the surcharge without reservation. Following this notification, Chainworks continued to perform under the contract. Again, Webco seems to lose sight of the fact that the parties had a requirements contract for the entire year. Therefore, Chainworks was relying on Webco to be its sole source of supply for the duration of the contract. Chainworks' continued authorization to manufacture and acceptance of the products was neither bad faith or misleading activity, but was the reasonable action of a sophisticated business entity faced with a no-win situation.

5.      Conclusion

As the foregoing analysis indicates, Webco's various attempts to justify its unilateral alteration of the fixed price contract term are without merit. Therefore, Chainworks is entitled to summary judgment. Finally, the Court cannot help but suspect that had the situation been reversed, and the steel market had collapsed and Chainworks attempted to escape the contract, this case would be before the Court in the opposite posture, with Webco asserting the binding nature of a requirements contract.

Leaving that aside, in the final analysis, the Court returns to the basic concepts ingrained into every law student during first-year Contracts. Chainworks' presented Webco with an offer for a requirements contract for the term of one year at a fixed price. Webco

accepted that offer in a manner consistent with the terms specified in the offer.  At that time, there was an offer, an acceptance, and consideration, and consequently, a contract.  Webco's attempt to unilaterally alter the contract after the fact is unavailing and amounts to a breach of contract.  Such unilateral action is contrary to the well-known principles of contract law that guide this case.  As succinctly summed up by the Third Circuit in another context, "[t]he sanctity of a contract is a fundamental concept of our entire legal structure.  Freedom of contract includes the freedom to make a bad bargain.  '*It is a fundamental principle of contract law, therefore, that, wise or not, a deal is a deal.*'"  *Chambers Dev. Co., Inc., v. Passaic County Utilities Authority*, 62 F.3d 582, 589 (3d Cir. 1995) (quoting *Morta v. Korea Ins. Corp.*, 840 F.2d 1452, 1460 (9th Cir. 1988)) (emphasis added).  Accordingly, Chainworks' motion for summary judgment on its breach of contract claim is granted and the Court will enter an order declaring that Chainworks does not owe  the total amount of the surcharges and price increase.[13]

B.    Webco's Counterclaims

Chainworks also seeks summary judgment on Webco's six counterclaims alleging breach of contract, account stated, unjust enrichment, promissory estoppel, fraudulent/negligent misrepresentation, and fraudulent suppression.  While a portion of Webco's breach of contract claim encompasses the issues addressed above, and is thus

---

[13]Although Chainworks has not requested summary judgment on Count Two of its complaint, it appears to the Court that the relief granted under Count One is identical to the relief requested under Count Two.  Accordingly, Count Two appears to be moot.

31

foreclosed by the Court's decision, the remaining counterclaims relate to Chainworks' failure to accept steel products and raw materials stockpiled by Webco in anticipation of a contract in 2005.  Webco also alleges that Chainworks breached an alleged consignment contract related to steel shipments during December 2004.

The parties do not dispute that they did not have a contract extending beyond December 31, 2004.  The undisputed evidence in the record reveals that, although the parties negotiated terms for a 2005 contract, an agreement was never reached.  In late September 2004, Webco notified Chainworks of its pricing for 2005 and explained it "must have [Chainworks] commitment for next years business no later than October 1, 2004."  Exhibit U, Pl.'s Br. Summ. J.  This deadline passed without a response from Chainworks.  On November 1, 2004, Webco notified Chainworks that it was revising its 2005 pricing and that it would need a commitment by November 12, 2004.  Again, the deadline passed without a response from Chainworks.  The parties appear to have engaged in further negotiations regarding whether pricing could proceed on a quarterly basis, but as revealed in Webco's emails during December 2004, no agreement on a 2005 contract was ever reached.  Exhibit Y, Z, Pl.'s Br. Summ. J.  In spite of this, Webco continued procuring raw materials and stockpiling inventory in anticipation of a contract in 2005.

Despite the fact that the parties did not have a contract for 2005, Webco contends that Chainworks is liable for breach of contract because it failed to accept the materials and inventory stockpiled at the end of 2004.  In an attempt to circumvent the absence of a

32

contract obligating Chainworks to pay for this material, Webco contends that this duty falls under the broad duty of good faith under the 2004 contract.   As stated previously, the parties entered into a requirements contract.  By its terms, the contract only covered Chainworks' steel tubing needs for 2004.  Nothing in the contract required Webco to manufacture products for a future time period outside the contract term.  More importantly, nothing in the 2004 contract obligated Chainworks to pay for such anticipatory manufacturing.  Webco appears to be attempting to add additional requirements to the contract, under the guise of the duty of good faith, that were clearly not a part of the parties' original agreement.  The duty of good faith  is confined to actions taken in performance of the terms of a contract.  *See* MICH. COMP. LAWS § 440.1203; *Flynn v. Korneffel*, 451 Mich. 186, 213 n. 8, 547 N.W.2d 249, 260 (1996).  It cannot be extended to include actions that are clearly outside the terms of an agreement.

At best, the evidence shows that Webco was putting itself in position to perform a potential, future contract.   This activity, however, does not place any obligation on Chainworks to pay for Webco's actions.  Rather, without a contract in place for 2005, Webco undertook the risk that it could be stuck with the stockpiled materials in the event that the parties did not reach a final agreement.  That is what occurred in this case.  Moreover, instead of "proceeding with the assumption" that a contract for 2005 would be implemented, *see* Exhibit Y, Pl.'s Mot. Summ. J., Webco could have easily avoided this situation by building the cost of materials for future contracts into the fixed contract price or by firmly enforcing

the requirement that an agreement for the following year be in place within a sufficient time prior to the end of the year, so that it had sufficient lead time to manufacture the products. Instead, Webco proceeded without a contract to its detriment. The undisputed evidence shows that the parties did not have a contract for 2005 nor that the 2004 contract included any obligation to stockpile materials in anticipation of future agreements.

Webco also alleges that Chainworks is liable for breach of contract with regard to shipments made in December directly to Chainworks for the purpose of establishing a consignment program with Tenneco. Webco contends that these shipments represented a separate agreement between the parties. This claim was not mentioned in Webco's amended counterclaims (Docket #34) and was raised for the first time in its response to Chainworks motion for summary judgment. Nevertheless, this claim is without merit and does not survive summary dismissal.

In advancing this argument Webco again loses sight of the fact that the parties agreed to a requirements contract for an entire year. This meant that during 2004, Chainworks was obligated to purchase all of its steel tubing from Webco and Webco was required to supply the tubing as Chainworks needed. In December, Chainworks notified Webco that it needed a certain amount of tubing because it was setting up a consignment program for its client, Tenneco. In other words, Chainworks was notifying Webco of its requirements for that month. This request was not outside the 2004 contract. Rather it was simply another shipment under the 2004 contract. Although Webco attempts to establish a separate

agreement with regard to this material, this effort is undermined by the fact that Webco has conceded that the consignment material was purchased "on the same terms as the parties' 2004 contract."  Def.'s Res. Br. at 26.  Further, at the time the consignment material was shipped Webco's employees appear to acknowledge that this material was a normal shipment and would be treated in the same manner as any other shipment under the contract.  Exhibit X, Def.'s Res. Br.  Moreover, this material was also purchased during the time period covered by the 2004 contract.  The only variance from the original terms of the contract was that the material would be shipped directly to Chainworks, rather than Tenneco.  This fact alone, however, does not transform this shipment into a separate contract.[14]

Accordingly, Webco's reliance on its stockpiling of material for 2005 and the December shipment of consignment material to support its breach of contract counterclaim is misplaced.  Therefore, summary judgment is appropriate on the breach of contract counterclaim.

Webco's remaining counterclaims are premised upon Chainworks' failure to purchase the stockpiled materials as well as Webco's belief that Chainworks did not have a consignment agreement with Tenneco.  These counterclaims are unavailing and are based on

---

[14]The Court also notes that in support of its claim that the consignment material was separately negotiated, Webco relies on correspondence that does not refer to the consignment material.  Exhibit Z, Def.'s Res. Br.  Webco contends that this letter demonstrates that the price of the consignment material was separately negotiated and later disputed by Chainworks, however, the letter addresses the "issue of shorts," material that appears to be distinctly different from the consignment material.  As such, this letter is clearly not relevant to the consignment material.

nothing more than speculation and unsupported theory.  With regard to the promissory estoppel claim, the undisputed evidence clearly shows that Chainworks did not make any promise to enter into a contract for 2005.  It appears that Webco is attempting to convert Chainworks' participation in negotiations regarding a 2005 contract into a promise upon which Webco relied.  Webco has not provided any authority for such a proposition. Moreover, Webco's estoppel argument is undermined by the fact that in December 2004 it clearly understood that Chainworks had not committed to a contract for 2005 as evidenced by Webco's emails stating that it could not ship materials after December 31, 2004 without an agreement in place.  Exhibit Y, Z, Pl.'s Br. Summ. J.  It is difficult to accept Webco's claim that it reasonably relied on a promise by Chainworks when Webco's own correspondence demonstrates its understanding that Chainworks had not made any such commitment.  *State Bank of Standish v. Curry*, 442 Mich. 76, 84, 500 N.W.2d 104, 107 (1993) ("[T]he reliance interest protected by [promissory estoppel] is *reasonable reliance*, and 'reliance is reasonable only if it is induced by an actual promise.'") (emphasis in original) (quoting *School Dist. No. 69 of Maricopa Co. v. Altherr*, 10 Ariz. App. 333, 340, 458 P.2d 537 (1969)).[15]  To the extent that Webco relies on dicta from *State Bank of Standish* to assert

---

[15]In addition, it can hardly be argued that enforcement of a promise is required in this situation to avoid an injustice.  *Charter Twp. of Ypsilanti v. General Motors Corp.*, 201 Mich. App. 128, 133, 506 N.W.2d 556, 558 (1993) (holding that elements of promissory estoppel include avoidance of an injustice through enforcement of the promise). Webco is a sophisticated business entity that engaged in an arms-length deal with another business entity.  No injustice will be avoided absent the enforcement of a promise in this case, particularly when Webco could have easily avoided the expenses incurred in preparation for a 2005 contract by enforcing its contract deadline to allow sufficient time to produce the materials for 2005.

36

that a promise can be inferred from Chainworks' conduct, the Court finds that this argument is unavailing. This Court will not convert either Chainworks' silence in the face of Webco's contract overtures or Chainworks' subsequent participation in negotiations into a binding and enforceable promise. Moreover, the fact that Chainworks may have decided to secure a different supplier for 2005, does not give rise to a duty to disclose to Webco that it will not enter into a new contract after their current contract ended. Nor does it preclude Chainworks from negotiating with Webco. Webco may have offered more favorable terms than other suppliers and Chainworks may have decided to continue the parties' relationship. Webco's attempt to cast Chainworks' activity in a sinister light is unavailing and fails to recognize that parties are free to contract with whom ever they wish.

Webco's fraud, negligent misrepresentation, and silent fraud claims are also without merit. The fraud claim fails because it rests solely on Webco's belief that Chainworks' consignment arrangement with Tenneco did not exist. Leaving aside the fact that Webco has failed to support this speculative claim with any evidence that Chainworks misrepresented any fact or that it intended that Webco act in reliance on any misrepresentation, Webco's claim fails because the purpose for which Chainworks requested the steel tubing is irrelevant, and thus not material to the parties' relationship. The correspondence between Webco's employees appears to recognize this fact. Exhibit X, Pl.'s Br. Summ. J. ("The consignment program is between Chainworks and Tenneco. Nothing will change on our end."). Because the parties had a requirements contract for the entire year, the reason for Chainworks' request is simply not relevant. Consequently, whether Chainworks was setting up a consignment

program, stockpiling extra inventory, or purchasing the material for any other reason is immaterial and does not support a claim of fraud.

Webco's negligent misrepresentation and silent fraud claims are similarly without merit and appear to be an attempt to convert Chainworks' failure to continue the parties contractual relationship into an effort to mislead Webco.  No evidence supports such a claim. Webco's remaining counterclaims are also without merit and cannot survive summary disposition.

Accordingly, Chainworks' motion for summary judgment on Webco's counterclaims is granted.  An order will be entered consistent with this opinion.

Date:   February 24, 2006            /s/ Robert Holmes Bell
                                     ROBERT HOLMES BELL
                                     CHIEF UNITED STATES DISTRICT JUDGE